**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　Plaintiff,<br>v.<br>ELPIDIO ENRIQUEZ,<br>　　　　　Defendant. | Case No.: 3:17-cr-03293-BEN-1<br><br>**ORDER DENYING DEFENDANT'S MOTION TO REDUCE SENTENCE UNDER THE FIRST STEP ACT, 18 U.S.C. § 3582(c)(1)(A)(i)**<br><br>**[ECF No. 66, 70, 71, 72, and 73]** |

**I.　INTRODUCTION**

Before the Court are Defendant Elpidio Enriquez's ("Defendant") two Motions to Reduced Sentence Under the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i), due to his cancer diagnosis. ECF Nos. 66, 73. For the reasons discussed below, the Court **DENIES** Defendant's Motions.

**II.　BACKGROUND**

**A.　Statement of Facts**

On September 17, 2002, a U.S. Naval helicopter spotted a "go fast" vessel,[1] which

---

[1] "Coast Guard officials refer to such vessels as 'go-fast' boats because they can travel at high rates of speed, which makes them a favored vehicle for drug and alien smuggling operations." *United States v. Perlaza*, 439 F.3d 1149, 1153, n.2 (9th Cir. 2006). "The preferred method of smuggling cocaine from South America to the United States in the Eastern Pacific requires the use of speedboats to transfer and land drugs and larger

upon being spotted, fled at a high rate of speed and threw bales of cocaine and an antenna overboard. Pre-Sentence Report, ECF No. 33 ("PSR") at 11; *see also* Opposition to Motion to Reduce Sentence, ECF No. 70 ("Oppo.") at 6:17-24. Eventually, the vessel yielded to commands, Defendant was identified as one of the crew members, and the vessel was discovered to contain approximately 1,586 kilograms of cocaine, being transported from Colombia to Guatemala. PSR at 11.

On a prior occasion in May 2003, Defendant pled guilty to Count 1, conspiracy to possess with intent to deliver 5 kilograms or more of cocaine while aboard a vessel, 46 U.S.C. §§ 1903(a), (g), 18 U.S.C. § 2, and 21 U.S.C. § 960(b)(1)(B)(ii), in exchange for the Government's dismissal of Count 2 for possession with intent to distribute 5 kilograms or more of cocaine while aboard a vessel subject to the jurisdiction of the U.S. Drug Enforcement Administration, 46 U.S.C. §§ 1903(a), (g), and (j)[2] and 21 U.S.C. § 960(b)(1)(B)(ii), and was sentenced to imprisonment for 135 months and a term of supervised release for 36 months. *United States of America v. Enriquez, et al.*, 8:02-cr-00370-JSM-E-J-1, ECF Nos. 63, 77, 78; *see also* PSR at 10-11; *see also* Oppo. at 6:22-7:1. On July 6, 2012, when his supervised released was to commence, Defendant was released to immigration and deported. PSR at 10; Oppo. at 7:1-2. On July 5, 2015, his supervised

---

logistical support vessels ('LSVs') to serve as roving refueling stations." *Id.* at 1153 n.2. "The term LSV was adopted following the shift in drug smuggling from the Caribbean to the Eastern Pacific and the discovery that fishing boats from Latin America were carrying extra fuel, food, and crew for smugglers aboard the Go–Fasts." *Id.* at 1153, n.3.

[2]   46 U.S.C. § 1903 was amended and reenacted as 46 U.S.C. § 70502, which is part of the Maritime Drug Law Enforcement Act, 46 U.S.C. § 70501, *et seq.* (the "MDLEA"). The MDLEA prohibits individuals on board a "covered vessel" from knowingly or intentionally distributing a controlled substance or attempting or conspiring to destroy property that is subject to forfeiture. 46 U.S.C. § 70503(a). It defines as a covered vessel as, *inter alia*, "a vessel subject to the jurisdiction of the United States." 46 U.S.C. § 70503(e). A vessel subject to U.S. jurisdiction is, in turn, defined as, *inter alia*, (1) "a vessel without nationality," (2) "a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States," (3) "a vessel in the customs waters of the United States," or (4) "a vessel in the territorial waters of a foreign nation if the nation consents to the enforcement of United States law by the United States." 46 U.S.C. § 70502(c).

release expired. *Id.*

On September 17, 2017, a little less than five (5) years after Defendant's release from custody, a United States ("U.S.") Marine Patrol Aircraft identified several vessels approximately 125 nautical miles south of the Mexico/Guatemala border, traveling in the vicinity of the U.S. Coast Guard Cutter ("USCGC") James I. PSR at 4; *see also* ECF No. 70 at 5:14-17. One of these vessels, a low-profile vessel ("LPV"),[3] carrying Defendant and two other individuals, Laureano Benitez-Montano and Jorge Ortiz-Salazar, was rendezvousing with several panga-style vessels to unload the drugs.[4] PSR at 5. Upon being spotted, Defendant's LPV did not flee. PSR at 4-5; *see also* Case No. 3:17-cr-03328-BEN USA, ECF No. 47. The USCGC dispatched a small boat to board and inspect the LPV and discovered 12 bales on board, amounting to 547 kilograms, which tested positive for cocaine. *Id.* at 4-5. Upon being interviewed, Defendant stated that he was recruited to transport 23 sacks of drugs from Colombia to Guatemala. *Id.* at 4.

On October 11, 2017, the grand jury issued an indictment, charging Defendant with two counts: Count 1, conspiracy to distribute cocaine on board a vessel, 46 U.S.C. §§ 70503 and 70506(b), and Count 2, knowingly and intentionally possessing, with intent to distribute, approximately 600 kilograms of cocaine, 46 U.S.C. § 70503, and aiding and abetting while on board a vessel, 18 U.S.C. § 2. ECF No. 1.

On January 23, 2018, Defendant agreed to enter a guilty plea. ECF No. 25. That

---

[3] LPVs are often partially submerged, making them difficult to spot and ideal for drug trafficking. In fact, a specific provision of the MDLEA is devoted to prohibiting such vehicles. *See, e.g.*, 46 U.S.C. § 70508(a) (prohibiting an individual from "operat[ing] by any means or embark[ing] in any submersible vessel or semi-submersible vessel that is without nationality and that . . . has navigated into, through, or from waters beyond the outer limit of the territorial sea of a single country or a lateral limit of that country's territorial sea with an adjacent country, with the intent to evade detection").

[4] While Mr. Ortiz, the captain of the LPV, was onboard one of the pangas, containing Juan Jose Valiente-Tomes and the captain, Luis Alberto Corado-Polanco, *see* Case No. 3:17-cr-03328-BEN USA, he spotted the USCGC, PSR at 4-5. Despite being told to stop by the USCGC, the panga continued at a high rate of speed. PSR at 4-5; *see also* ECF No. 70 at 5:14-21. The USCGC fired warning shots, but the panga continued forward until the helicopter shot the engines to disable the panga. PSR at 4.

same day, Defendant signed a written plea agreement, pursuant to which he agreed to plead guilty to Count 2 of the Indictment in exchange for the Government's agreement to (1) "not . . . charge him with an enhanced penalty for the instant offense pursuant to 21 U.S.C. § 851, which under the facts of this case, carries a 20-year mandatory minimum sentence" and (2) "dismiss Count 1 of the underlying indictment without prejudice after Defendant is sentenced." ECF No. 26 at 2.

On January 29, 2018, Magistrate Judge William Gallo issued his Findings and Recommendation that the Court accept Defendant's guilty plea. ECF No. 29. On March 5, 2018, after no objections were received, this Court accepted Judge Gallo's Findings and Recommendation and Defendant's plea of guilty. ECF No. 31. At the sentencing hearing, the Government recommended a sentence of 120 months in custody. ECF No. 46. Defendant requested a sentence of 120 months in custody and three years of supervised release, ECF No. 47. Based on Defendant's total offense level of 37 and a Criminal History Category II, the guideline range was 235 months to 293 months. PSR at 13.

On July 31, 2018, this Court sentenced Defendant to 180 months (15 years) in prison and 10 years of supervised release. ECF No. 57. During the sentencing hearing, the Court noted that had the Government filed an information pursuant to 18 U.S.C. § 851, the mandatory minimum sentence would have been twenty years (240 months). ECF No. 60 at 5:10-17. The Court calculated Defendant's adjusted offense level as 36, carrying a guideline sentence of 210 months to 260 months. *Id.* at 19:16-20:15. "After considering the 3553(a) factors," the Court varied below the guidelines range and found "a sentence of 180 months [was] reasonable and sufficient but not greater than necessary." *Id.* at 20:20-24.

On October 16, 2019, a little over a year after his sentencing, Defendant was seen by urology and was scheduled for an urgent prostatectomy. Exhibit "E" to Motion, ECF No. 67 at 31, 54; *see also* Oppo. at 7:4. On December 10, 2019, Defendant underwent a robotic assisted prostatectomy, designed to remove his prostate gland and cancer.[5] *See*

---

[5] Prostate "cancer is the most common, but not the most deadly, cancer for men over

Exhibit "E" to Motion, ECF No. 67 ("Ex. E") at 9, 14, 41; Oppo. at 7:4-5.

Defendant's post-operative pathology reports show a prostatic adenocarcinoma involving the right and left halves of the prostate, with a Gleason Score of 6 (3+3),[6] extending down to and involving the right and left anterior regions of the apex of the appendix. *See* Exhibit "E" to Motion, ECF No. 67 at 41-42; *but see id.* at 45 (noting in the Operative Report, that his Gleason's Score was 4+7). His post-operative medical records also confirm the specimens from his removed prostate showed a tumor that was invasive beyond the capsule, making the extent of the tumor T3,[7] *see* Ex. E at 41, 48, meaning his cancer was Stage IIIB, *see* https://www.cancer.org/cancer/prostate-cancer/detection-diagnosis-staging/staging.html. Further, his pre-operative PSA level was 9.5, and his cancer was present in 3 of 12 cores biopsied. Ex. E at 28-29. His post-operative PSA increased from 0.27 on March 20, 2020, to 0.32 on April 20, 2020, to 0.42 on August 20,

---

65 years" and "accounts for 14% of all cancers, 27.5% of all male cancers (65,000 cases per year) and 51% of all genitourinary cancers." Brutman, Betty M.D., J.D., 6 *Attorneys Medical Advisor*, § 57:49, (April 2021 Update). That being said, it "is the second leading cause of cancer deaths among males," accounting "for 10% of cancers deaths in men" during 2013. *Id.* "Although the 5-year survival with prostate cancer was 69% in the mid-1970s, virtually no one dies of prostate cancer within 5 years in current times." *Id.*

[6] "For adenocarcinomas, the degree of differentiation has prognostic significance and pathologists judge biopsy specimens using the Gleason grading system, which assesses the architectural details of malignant glands under low to medium magnification." Brenner, Dean E., Lippman, Scott M., *Cancer: Prin. and Pract. of Oncology* (Lippincott, Williams, & Wilkins, 11th Ed. Ch. 70, November 2018 Update). The Gleason Score is a new method of grading prostate cancer, which divides prostate cancer into the following groups: (1) Grade group 1 (Gleason score ≤6); (2) Grade group 2 (Gleason score 3 + 4 = 7); (3) Grade group 3 (Gleason score 4 + 3 = 7); (4) Grade group 4 (Gleason score 4 + 4 = 8); and (5) Grade group 5 (Gleason scores 9 and 10). *Id.* This "new system simplifies the grading of prostate cancer, appropriately classifies the lowest risk as grade group 1 (rather than Gleason score 6), and accurately predicts prognosis." *Id.* Patients are considered to have aggressive tumors if they have either a biopsy Gleason score greater than 7 or Gleason grade group greater than 2; advanced local lesions (T3 to T4); a protein-specific antigen ("PSA") level exceeding 20 ng/mL; or symptoms suggestive of metastatic disease. *Id.*

[7] "Pathologic stage T3 represents tumor that has extended out of the prostate gland." George J., *Sternberg's Diagnostic Surgical Pathology* (Lippincott, Williams, & Wilkins, 6th Ed. CH45, February 15, 2015).

1  2020, indicating the prostatectomy was not entirely successful and residual cancer remained. Ex. E at 22- 24; *see also* Oppo. at 7:5-6 (admitting the cancer has recurred).

James J. Stark, M.D., F.A.C.P. ("Dr. Stark") has opined that Defendant's recurrent cancer has been treated through medications, like Lupron, designed to attempt to keep his cancer under control. Oppo. at 7:6-8. Currently, this treatment is working, and "his PSA is falling," but "[t]ypically[,] at some point the Lupron he is getting stops working and the PSA continues to rise." ECF No. 66-1 at 4; *see also* Oppo. at 7:8-9. However, Defendant's medical records show that he has continued to receive medical care for his ongoing medical issues related to his prostate cancer. Oppo. at 7:9-13.

On August 3, 2020, Defendant submitted his first request for a reduction in his sentence. Exhibit "C" to Motion, Exhaustion Documents, ECF No. 66-1 at 8-13. On August 6, 2020, he submitted another request to the warden. *Id.* at 14. On September 3, 2020, the warden responded, denying his request. *Id.* at 15.

On November 30, 2020, Defendant filed his Motion to Reduce Sentence Under the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i), seeking a reduction in his sentence to either (1) time served or (2) 120 months. Motion, ECF No. 66 ("Mot.") at 4.

On December 14, 2020, this Court issued an Order setting a briefing schedule related to Defendant's Motion. Order, ECF No. 68. In its order, the Court requested briefing on "whether, if the Court considered Defendant's request to qualify as extraordinary and compelling reasons to reduce the sentence, the Court has the authority to (1) reduce a sentence pursuant to Section 3582(c)(1) where the defendant has not yet served the time required under the statutory mandatory minimum and (2) reduce or eliminate the statutorily required period of supervised release in order to allow Defendant to return to his home country of [Colombia], as he requests." *Id.*

On December 21, 2020, Defendant received his first dose of the COVID-19 vaccine and tested negative for COVID-19 on December 29, 2020. Oppo. at 7:14-15. On January 7, 2021, the Government filed a response opposing Defendant's motion. Opposition, ECF No. 70 ("Oppo."). On January 25, 2021, Defendant replied. Reply, ECF No. 71 ("Reply").

On May 11, 2021, Defendant then filed a second "Emergency Motion to Reduce His Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). ECF No. 73.

Defendant has served forty-three (43) months, or less than a quarter, of his sentence. Oppo. at 7:17.

### III. LEGAL STANDARD

Generally, a "court may not modify a term of imprisonment once it has been imposed." 28 U.S.C. § 3582(c); *see also United States v. Keller*, No. 20-50247, ---F.4th---, 2021 WL 2695129, at *2 (9th Cir. July 1, 2021). However, an exception allows courts to do so in any case where a motion is filed by either the (1) Director of the BOP, or (2) a federal inmate, after the earlier of having (a) "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or (b) the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 28 U.S.C. § 3582(c)(1)(A); *see also Keller*, 2021 WL 2695129, at *3 (holding that a district court may not excuse a defendant's failure to satisfy the exhaustion requirement over the government's timely objection).

Courts considering a motion for compassionate release may (1) consider the factors set forth in 18 U.S.C. § 3553(a)[8] to the extent they are applicable and (2) find *either* that (a) "extraordinary and compelling reasons warrant such a reduction" *or* (b) three criteria have been satisfied: (i) the defendant is at least 70 years of age, (ii) has served at least 30 years in prison pursuant to a mandatory life sentence imposed for a violent offense for which the defendant is currently imprisoned, and (iii) the Director of the BOP determines the defendant is not a danger to the safety of any other person or the community." Whether

---

[8] Courts considering a motion brought under 18 U.S.C. 3582 ("Section 3582") may consider the factors contained in 18 U.S.C. 3553(a) ("Section 3553(a)"), which include examining the (1) "nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "need for the sentence imposed"; (3) "kinds of sentences available"; (4) "kinds of sentences and the sentencing range established"; (5) "pertinent policy statement"; (6) "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and (7) "need to provide restitution to any victims of the offense."

a motion for compassionate release is based on a finding of extraordinary and compelling reasons or the Director of the BOP's finding that an elderly prisoner serving a life sentence is not dangerous, the Court must also find that "a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 28 U.S.C. § 3582(c)(1)(A). Thus, Section 3582(c)(1)(A) requires courts considering compassionate release motions to consider "applicable policy statements issued by the Sentencing Commission." However, *United States v. Aruda*, 993 F.3d 797, 801 (9th Cir. 2021), clarified that "[t]here is as of now no 'applicable' policy statement governing compassionate-release motions filed by defendants under the recently amended § 3582(c)(1)(A), and as a result, district courts are 'empowered . . . to consider *any* extraordinary and compelling reason for release that a defendant might raise.'"

## IV. DISCUSSION

Defendant argues that compassionate release is warranted due to (1) his cancer diagnosis, which requires increasing attention and care and (2) the fact that his age, cancer, and health history put him at high risk of suffering serious complications if he were to contract COVID-19. *See* Mot. He seeks a reduction in his sentence to either (1) time served or (2) 120 months (10 years). *Id.* at 4:16-23. He argues that 120 months would allow him to be with his family rather than the BOP in about five years, taking into account when he starts seriously deteriorating from prostate cancer. *Id.* at 4:14-5:2. Second, Defendant asks the Court to allow him to return to his home country of Colombia, where his family can help support and care for him, noting that "the Colombian healthcare system is an effective system for poor people." *Id.* at 19:8-21. Third, Defendant asks the Court to reduce the $500.00 fine imposed on him at sentencing, ECF No. 57 at 5, because "[h]e has been unable to work for the duration of the pandemic," and "[h]is terminal prostate cancer will significantly reduce his ability to work in about five years." *Id.* at 5:7-28, 20:23-26.

In its Opposition, the Government argues that "[t]o release Defendant, a recidivist maritime drug trafficker of staggering amounts of cocaine after he has served just 39 months of his 180-month sentence would create unwarranted sentencing disparities,

undermine its deterrence effect, and undercut the seriousness of his crime." Oppo. at 9:12-16. At the same time, the Government "acknowledges that with prostate cancer Defendant has a serious condition that qualifies as 'extraordinary and compelling.'" *Id.* at 9:23-24. Nonetheless, it contends that the Section 3553(a) factors counsel against reducing Defendant's sentence because (1) his "medical conditions are being appropriately managed at the facility," (2) Defendant has already received the COVID-19 vaccine, and thus, has a very small risk of contracting COVID-19, (3) Defendant has not proposed a release plan to ensure he receives the appropriate medical care, considering he fails to mention how he will receive medical care, especially considering Colombia's healthcare system is also overwhelmed by the COVID-19 pandemic, and (4) Defendant has failed to serve a meaningful portion of his sentence, meaning his reduced sentence would not serve as an effective deterrent to Defendant or others in the community. *Id.* at 10:10-13:3-5, 14:12-15.

In his reply brief, Defendant points out that the Government's Opposition (1) concedes that Defendant has extraordinary and compelling reasons for a reduction in sentence and (2) fails to contest his request for a reduction in his fine. Reply at 1:17-20, 7:1-14. However, he focuses his reply "on his request for a reduction to 120 months . . . rather than the alternative time-served sentence he requested in his motion in late November" because he "received his first dose of the COVID-19 vaccine in late December, and he may have recently already received his second dose." *Id.* at 2:24-27. He also concedes that while at the time of sentencing, 120 months was appropriate given his criminal history and role in the offense, the Section 3553(a) factors have changed now given he has received good work reviews, has no disciplinary history, and his medical condition means a minimal chance of recidivism given if he were to commit another offense, he knows he will likely die in prison. *Id.* at 2:2-17.

As outlined below, the Court finds that Defendant has shown extraordinary and compelling reasons to reduce his sentence and exhausted his administrative remedies. The Court also finds that the Section 3553(a) factors weigh against a sentence reduction. Since Defendant's sentence will not be reduced, he will have additional time to pay his fine.

### A. Reduction in Sentence

A motion under Section 3582 entails two primary inquiries: "first, whether Defendant has satisfied the administrative exhaustion requirement, and second, whether Defendant has demonstrated extraordinary and compelling reasons for a sentence reduction." *United States v. Galaz*, 477 F. Supp. 3d 1134, 1137 (S.D. Cal. 2020); *see also Keller*, 2021 WL 2695129, at *4-5. "A defendant bears the burden to show special circumstances meeting the bar set by Congress and the Sentencing Commission for compassionate release to be granted." *United States v. Shabudin*, 445 F. Supp. 3d 212, 214 (N.D. Cal. 2020).

As discussed below, the Court finds that after undertaking both inquiries, they weigh in favor of granting Defendant's Motion; however, the Section 3553(a) factors weigh against it. Additionally, Defendant has not met his burden of providing a release plan given the record contains inconsistent statements as to whether Defendant is married, and if he is married, whether his wife lives in the U.S. or Colombia.

#### 1. *Exhaustion of Administrative Remedies*

Section 3582(c)(1)(A) imposes an exhaustion requirement, which upon timely objection by the government, must be satisfied before a defendant may move the court for release. *Keller*, 2021 WL 2695129, at *4. Here, both parties agree that the Court may consider Defendant's motion as a procedural matter because more than thirty (30) days have lapsed since Defendant asked the warden to file a motion on his behalf. Reply at 3:2-7; *see also* Oppo. at 9:27-28. Thus, Defendant has exhausted his administrative remedies.

#### 2. *Extraordinary and Compelling Reasons*

A defendant meets the requirements of "extraordinary and compelling reasons" where the medical condition of the defendant "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S. Sent'g Guidelines Manual § 1B1.13, cmt. n.1. The conditions listed include where the defendant suffers from a (1) "terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory)," such as

"metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia" and/or (2) "a serious physical or medical condition," (3) "a serious functional or cognitive impairment," or (4) "deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *Id.* However, the Ninth Circuit recently joined five other circuit court of appeals in holding that "the current version of U.S.S.G. § 1B1.13 is not an applicable policy statement for 18 U.S.C. § 3582(c)(1)(A) motions filed by a defendant." *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021) (reversing a district court's denial of a compassionate release motion because it treated U.S.S.G. § 1B1.13 as binding) (internal quotation marks and alterations omitted) (citing cases). Thus, "[t]he Sentencing Commission's statements in U.S.S.G. § 1B1.13 may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but they are not binding." *Id.*

Although initially, Defendant moved the Court for a reduction in his sentence, in part, due to COVID-19, and emphasized his need for immediate release due to his high risk of suffering serious complications like death or severe illness from coronavirus, *see* Mot. at 4:11-15, 11:18-20, his reply focuses on his request for a reduction to 120 months because he admits his COVID-19 concerns are mitigated now that he has been vaccinated,[9] *see* Reply at 2:24-27. Thus, the Court does not consider whether his particular COVID-19

---

[9]   Defendant acknowledges that he received his first dose of the COVID-19 vaccine on December 21, 2020, and "may have recently already received his second dose." Reply. at 2:24-27; *see also* Oppo. at 2:1-2, 10:10-11. Thus, "[a]lthough there are still risks to those who are vaccinated, Mr. Enriquez's risk from COVID-19 has been somewhat reduced." Reply. at 2:27-28. Indeed, the BOP's website shows that there have been 944 full inmate inoculations at Fort Worth FMC, *see* https:// www.bop.gov/coronavirus/index.jsp, out of 1,308 total inmates, *see* https://www.bop.gov/ locations/institutions/ftw/. The CDC's website indicates that clinical trials have shown that "[i]n a multistate network of U.S. hospitals during January–March 2021, receipt of Pfizer-BioNTech or Moderna COVID-19 vaccines was 94% effective against COVID-19 hospitalization among fully vaccinated adults and 64% effective among partially vaccinated adults aged ≥65 years." https://www.cdc.gov/mmwr/volumes/70/wr/mm7018 e1.htm?s_cid=mm7018 e1w.

concerns qualify as extraordinary and compelling reasons to reduce his sentence and focuses on his request for a reduction due to his cancer. Both parties agree Defendant's prostate cancer is a serious medical condition qualifying as an extraordinary and compelling reason warranting a reduction. *See id.* at 1:17-20 (citing Oppo. at 9-10 (citing 18 U.S.C. § 3582(c)(1)(A))). However, despite agreeing Defendant's cancer qualifies as an extraordinary and compelling reason for reducing his sentence, the Government argues the Section 3553(a) factors weigh against a sentence reduction. Oppo. at 14:16.

Defendant's request for a reduction to time served or 120 months seeks either a reduction to or below the mandatory minimum sentence. According to Defendant's Motion, he has "served the equivalent of a 45-month sentence so far, taking good time credits into account." Mot. at 19:12-13. In other words, Defendant has almost completed four years of his ten-year mandatory minimum sentence. Because the Court finds that the Section 3553(a) factors weigh against any sentence reduction, the Court proceeds with analyzing those factors first.

### 3. *Section 3553(a) Factors*

Courts considering a motion brought under Section 3582 must find that extraordinary and compelling reasons warrant a sentence reduction, and may consider the factors contained in Section 3553(a), which include, but are not limited to, examining the: (1) "nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "need for the sentence imposed"; (3) "kinds of sentences available"; (4) "kinds of sentences and the sentencing range established"; (5) "pertinent policy statement"; and (6) "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Upon release, Defendant asks to return to Buenaventura, Colombia to live with his family.[10] Mot. at 19:14-16. He states that his sons would be able to help support him and

---

[10] While Defendant's Motion indicated his wife and children lived in Buenaventura, Colombia, his supplemental briefing submitted *pro se*, rather than by his counsel, states that his wife of nearly forty years lives in the U.S., and if given the opportunity to be released, he could reside with her. ECF No. 73 at 5. Thus, it is unclear whether his wife

get him the medical care and cancer treatment he needs. *Id.* at 19:16-18. He notes that "the Colombian healthcare system is an effective system for poor people: The system has near-universal health insurance coverage, and ranks worldwide just between Belgium and Sweden, according to researchers at the World Health Organization." *Id.* at 19:18-21. The Government responds that "the Section 3553(a) factors counsel against release because Defendant has not served a meaningful portion of the sentence imposed by the Court." Oppo. at 1:19-21. Defendant replies that allowing his sentence reduction is consistent with the Guidelines as it would allow his family to support him as he dies while also allowing "the BOP to focus on others with complicated illnesses, rather than expend significantly resources on Mr. Enriquez." Reply at 2:20-23. The Court considers the factors in turn but finds that on balance, they counsel against a sentence reduction at this time.

        a.    *The nature and circumstances of the offense and the history and characteristics of the defendant*

The nature (drug trafficking of over 500 kilograms of cocaine) and circumstances (his second offense for the very same serious criminal conduct) of the Defendant's offense are serious. Although Defendant argues his chances of recidivism are lower given his limited lifespan and knowledge that if he commits the offense again, he will die in prison, Mot. at 18:20-19:9, the Court finds this assertion speculative and concludes this factor substantially counsels against a reduction.

        b.    *The need for the sentence imposed*

Courts evaluating this factor have found that "the biologically likely span remaining to a defendant is . . . logically relevant to the § 3553(a) sufficiency of a given sentence. *United States v. Karr*, No. 6:17-CR-25-REW, --- F. Supp. 3d ---, 2020 WL 774363, at *2

---

lives in Buenaventura or the U.S., and if she would be available to care for him if he returns to Colombia. More importantly, the PSR in this case states that Defendant "advised that he is single." PSR at 12, ¶ 49 (stating that Defendant is the father of three children from a previous relationship with a Rita Ortiz, who resides in Colombia). The inconsistencies in Defendant's release plan as to where he would reside following his release fail to show he has carried his burden in providing the Court with a satisfactory release plan.

-13-

n.16, 5 (E.D. Ky. Feb. 18, 2020) (noting that "the Guidelines provide for a presumptive 'life' term only for the gravest (by offense level measurement) crimes"). "Put differently, at least when confronting a terminal case, the Court finds it fair to consider—in plumbing what is enough, but not more than enough—the relative portion of a defendant's remaining life that sentence will take." *Id.* Here, Defendant requests either time served or 120 months. Even his request for 120 months would require him to serve another five years in federal custody, facing the possibility of dying in prison. Defendant argues his illness makes it highly unlikely he will continue trafficking drugs. However, the counterargument to this is that he may instead embrace a life of crime given he has nothing left to lose now that he has a cancer diagnosis. This concern is bolstered by Defendant's prior conviction for the same offense, suggesting he is likely to recidivate.

When evaluating the second Section 3553(a) factors, courts also evaluate the need for the sentence imposed in order to (a) "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; (b) "afford adequate deterrence to criminal conduct"; (c) "protect the public from further crimes of the defendant"; and (d) "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). Here, all of these factors weigh against a sentence reduction.

First, the Court finds Defendant's sentence is necessary to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." *See* 18 U.S.C. § 3553(a)(2)(A). Second, Defendant's current sentence should also adequately deter others from becoming repeat offenders, thereby "afford[ing] adequate deterrence to criminal conduct." *See* 18 U.S.C. § 3553(a)(2)(B). As the Government points out, Defendant was sentenced to 135 months for his previous conviction and was released in 2012. Five years later, Defendant returned to the same criminal conduct and was convicted of the same crime. *See* Oppo. at 12:26-13:1 (citing ECF No. 60 at 6). Accordingly, strong deterrence is required in this case. Third, "[a] drug trafficker is, by legal definition, a danger to the community." *United States v. Ailemen*, 165 F.R.D. 571,

596 (N.D. Cal. 1996) (citing 18 U.S.C. § 3142(e)). Thus, the current sentence also protects the public from further crimes by the Defendant. *See* 18 U.S.C. § 3553(a)(2)(C).

Finally, as to "provid[ing] the defendant with needed … medical care … in the most effective manner," *see* 18 U.S.C. § 3553(a)(2)(D), the Government points out that Defendant's medical conditions are being appropriately managed where he is incarcerated, and his proposed release plan does not adequately ensure he will receive appropriate medical care. Oppo. at 10:8-13. Accordingly, even consideration for Defendant's needed medical care and vocational training weighs against a sentence reduction.

Thus, the second factor weighs against a sentence reduction as well.

        c.    *The kinds of sentences available compared with the sentencing range established for the category of offense in effect when the defendant is sentenced*

As to the third and fourth factors, with respect to alternative kinds of sentences, such as supervised release and home confinement, such options have limited applicability here given Defendant is subject to deportation. Further, as to the kinds of sentence compared with the sentencing range for the category of offense in effect on the date the defendant was sentenced, the Court sentenced Defendant in excess of the 120-month mandatory minimum due to his criminal history. However, the Court calculated Defendant's adjusted offense level as 36, carrying a guideline sentence of 210 months to 260 months. ECF No. 60 at 19:16-20:15. Thus, Defendant's sentence of 180 months was well below the guideline range in effect on the date he was sentenced. Given supervised release and home confinement are not options due to Defendant's immigration status, factors three and four weigh against a sentence reduction.

        d.    *Pertinent policy statement*

As to the pertinent policy statement, the *Aruda* decision made clear that "[t]here is as of now no 'applicable' policy statement governing compassionate-release motions filed by defendants under the recently amended § 3582(c)(1)(A), and as a result, district courts are 'empowered . . . to consider *any* extraordinary and compelling reason for release that a

defendant might raise.'" *Aruda*, 993 F.3d at 801 (citing *McCoy*, 981 F.3d at 284 (quoting *Brooker*, 976 F.3d at 230)). As such, this factor has no impact on this case.

  e. *The need to avoid unwarranted disparities among defendants with similar records and found guilty of similar conduct*

As to the sixth factor, or the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, this factor weighs against a sentence reduction. "Drug trafficking . . . creates additional real dangers—through crimes committed by addicts seeking to support their habits, through plain human suffering, and because people engaged in the sale of illegal substances sometimes commit or direct violent crimes in furtherance of their enterprises." *United States v. Ailemen*, 165 F.R.D. 571, 596 (N.D. Cal. 1996). Further, if the Court reduces Defendant's sentence, it will result in a sentence below the sentence received for Defendant's first 2002 maritime drug smuggling offense. A reduced sentence to 120-months for a second serious drug trafficking offense would result in sentencing disparities for defendants found guilty of similar conduct. This weighs against a sentence reduction.

  f. *Conclusion*

This case resembles the case of *United States v. Jones*, 980 F.3d at 1102, to which the Court turns for insight. In *Jones*, the Sixth Circuit affirmed the district court's decision, finding that even though extraordinary and compelling reasons existed to reduce the defendant's sentence, the Section "3553(a) factors counseled against granting compassionate release." 980 F.3d at 1102. The *Jones* defendant had been sentenced to a ten-year mandatory minimum sentence for intent to distribute and distribution of cocaine base. *Id.* The defendant was exposed to a high risk of complications from COVID-19 due to his age (over 40); respiratory issues due to his exposure to tuberculosis in 2003; and obesity. *Id.* However, the district judge reasoned that even though these likely qualified as extraordinary and compelling reasons to reduce the defendant's sentence, the defendant had only served two years of his decade-long mandatory minimum sentence and was a repeat offender, who had previously served eighty-seven months for a serious trafficking

offense and another thirty months for violating his supervised release, so this was not his "first rodeo in Federal Court." *Id.* at 1115. Thus, the Sixth Circuit affirmed the district judge's denial of the defendant's compassionate release motion. *Id.*

Just as the *Jones* defendant had previously served eighty-seven months for a serious trafficking offense, Defendant was sentenced for transporting a high quantity of cocaine (547 kilograms) for the second time and has not yet served half of his mandatory minimum sentence. *Compare* 980 F.3d at 1115 with PSR at 10-11. It is to be noted that Defendant previously served nine years for his first, but equally serious, trafficking offense. Like the *Jones* court, this Court finds that although Defendant has shown extraordinary and compelling reasons for reducing his sentence, the Section 3553(a) factors counsel against the reduction.

Given the Court finds none of the Section 3553(a) factors weigh in favor of a sentence reduction, the Court **DENIES** Defendant's request for a reduction to time served as well as his alternative request for a reduction to the mandatory minimum of 120 months.

### B.      Whether the Court Can Release Defendant to Colombia

The Court requested briefing on whether "the Court has the authority to . . . reduce or eliminate the statutorily required period of supervised release in order to allow Defendant to return to his home country of [Colombia], as he requests." Order, ECF No. 68 at 8:8-14. Despite this request, neither party addressed this issue. *But see United States v. MacCallum*, No. 1:15-CR-00204 EAW, --- F. Supp. 3d ---, 2021 WL 28016, at *6 (W.D.N.Y. Jan. 5, 2021) (denying a motion for compassionate release where the defendant presented a significant risk of recidivism, his Canadian citizenship prevented him from being released to home confinement, and "if deported to Canada, MacCallum will be unsupervised," meaning "the effective prison sentence he will have served is just over 45 months with no supervised release to follow"). This issue is relevant to the Court's authority to grant Defendant's request for time served so he can return to Colombia. However, given the Court denies Defendant's motion to reduce his sentence, he has no immediate need to return to Colombia. Thus, the Court declines to address this issue.

### C. Fine

At sentencing, the Court also ordered Defendant to pay a fine of $500.00. ECF No. 57 at 5. Defendant seeks a reduction in his $500.00 fine under § 3582(c) because "[h]e has been unable to work for the duration of the pandemic," and "[h]is terminal prostate cancer will significantly reduce his ability to work in about five years." Mot. at 20:23-26. He asks the Court to reduce his punitive fine due to his lowered ability to pay to $100.00 or $200.00 dollars. *Id.* The Government fails to address or contest the reduction in fine. *See generally* Oppo. Accordingly, Defendant replies that this failure results in the Government forfeiting any argument against a reduction to his fine. Reply at 7:1-14. He also notes that even though "he is vaccinated, he will still have a significantly reduced ability to work in about five years, according to Dr. Stark." *Id.* at 7:7-9 (citing Mot., Ex. A).

Defendant provides the Court with no information as to how much he earns at his job at the prison in order to assist the Court with determining how much he has already earned and how much he still owes. "According to the Zoukis Consulting Group, a firm that specializes in helping new prisoners acclimate to life in federal prisons, 'most prisoners only make $10 to $20 per month, which is hardly enough to buy commissary items, call home, buy songs for their MP3 players, or email home.'" Molly Guptill Manning, *Access Denied: How 28 U.S.C. S 1915(g) Violates the First Amendment Rights of Indigent Prisoners*, 19 Seattle J. for Soc. Just. 455, 487 (2021). Assuming Defendant earns between $10.00 and $20.00 per month, he would have earned between $430.00 and $860.00 in his forty-three (43) months in prison to date. However, that assumes he was able to work every day since arriving at his facility, which his Motion indicates has not been the case due both to his cancer and the pandemic. It also assumes Defendant used none of his earnings for calls to his family or commissary items. Nonetheless, because the Court is denying Defendant's request to reduce his sentence, the Court also denies his request to reduce his fine given, even assuming Defendant is unable to work every day due to his prostate cancer, Defendant still has ample time remaining in his sentence to repay the fine.

### V. ORDER

For the above reasons, Defendant's Motion is **DENIED without prejudice**. Should Defendant's condition become terminal, the Court may at that time reconsider this Order.

**IT IS SO ORDERED.**

DATED:   August 24, 2021

**HON. ROGER T. BENITEZ**
United States District Judge